**PREMIUM FINANCING SPECIALISTS, INC., Plaintiff–Appellant,**

v.

**INTERNATIONAL SURPLUS LINES INSURANCE COMPANY, et al., Defendants–Appellees.**

No. 90–3247.

United States Court of Appeals, Fifth Circuit.

Aug. 9, 1991.

---

John R. Santa Cruz and Neal D. Hobson, Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, La., for plaintiff-appellant.

Leon A. Aucoin, Aucoin, Unland & Eppling, Metairie, La., for Intern. Surplus and London Agency of Louisiana.

William H. Howard, III and Shawn L. Holahan, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., H. Alston Johnson, III, Phelps, Dunbar, Marks, Claverie & Sims, Baton Rouge, La., and Luthor T. Munford, Phelps, Dunbar, Marks, Claverie & Sims, Jackson, Miss., for Mason Co.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before HENLEY *, KING and GARWOOD, Circuit Judges.

HENLEY, Circuit Judge.

Premium Financing Specialists, Inc. ("PFS"), a Missouri corporation, brought this diversity action against The London Agency of Louisiana ("London"), International Surplus Lines Insurance Company ("International"), The Monson Company ("Monson") (collectively referred to as the defendants) and Youngs Management Corporation ("YMC"). PFS sought the return of money it paid for insurance premiums. PFS's claim against YMC was dismissed by consent. The district court, on cross motions for summary judgment, granted the defendants' motion for summary judgment. PFS appeals this ruling. We affirm.

This case is factually intricate. We adopt the findings of fact made by the district court which are essentially as follows. YMC manages property for others. One of its duties in 1988 was to renew property insurance on various properties owned by several of its clients (the "insureds"). In an effort to secure renewal, YMC contacted Lucas J. Bacino ("Bacino") of Bacino and Associates ("B & A"), a

* Circuit Judge of the Eighth Circuit, sitting by designation.

Louisiana insurance agency. Bacino agreed to furnish quotes and to assist YMC in obtaining the desired coverage. B & A's practice was to shop the market for a particular policy after being contacted by parties seeking coverage. B & A subsequently contacted Monson, an insurance brokerage firm which generally acts as the middle man between licensed retail agents, such as Bacino, and insurance underwriters.

Monson then contacted London, an insurance underwriter. London had a contract with International pursuant to which London had the authority to receive, accept and bind proposals for contracts of insurance and, with respect to the issuance and execution of insurance policies, to act as attorney-in-fact of International. Monson, on the other hand, was not the agent of London and had no authority to bind London or any of its principals.

London provided Monson with several insurance options, and Monson in turn relayed these options to B & A. Monson also contacted other insurance brokers and underwriters to find other available policies. Bacino requested that Monson confirm that payment to Bacino would constitute payment to Monson, but Monson refused all such requests.

Meanwhile, B & A contacted several premium financing companies to finance the insurance premiums. It was during this search that B & A contacted PFS. PFS confirmed that Bacino was attempting to arrange coverage for YMC. PFS also requested that its payment of the premium to Monson be considered payment to London on behalf of International. While London initially refused this request, it eventually consented after Monson guaranteed in writing that it would be responsible for paying the premium to London. After this agreement was reached, Monson issued its binder dated June 21, 1988 to B & A.

London issued its binder on June 24, 1988 to Monson. On July 13, 1988 Bacino sent PFS a premium financing agreement which appeared to have been authorized by Christopher Youngs, YMC's representative. Unknown to PFS, Bacino had forged Youngs'

signature on the document. After receiving the finance agreement, PFS sent a check to Monson in payment of Policy No. 15417. Monson received the check on July 13, 1988. The policy was issued on July 21, 1988. Upon its issuance, the policy was provided to Monson. Monson then forwarded a portion of PFS's payment to London, which accepted payment as the managing general agent of International.

Unfortunately for all concerned, Bacino secretly negotiated another premium financing agreement between YMC and Bankers Trust of Louisiana ("Bankers Trust") for the same insurance policy.[1] Under this agreement, Bankers Trust issued its check as payable to B & A rather than to the broker or underwriter. The result is that the premiums for Policy No. 15417 were apparently financed twice, both times through the machination of Bacino.

YMC never made the first payment on the purported financing agreement between it and PFS. Bacino converted the funds he received from Bankers Trust for his personal use, apparently exhausting them. PFS seeks the return of the funds it paid.

PFS presents two arguments which it claims entitle it to a refund of the money it paid to the defendants. Its first claim for restitution is under La.Civ.Code Ann. arts. 2301–02 and 2304. These articles provide for return of a payment of a "thing not due" under Louisiana law. The text of the articles states,

Art. 2301. Obligation to restore thing unduly received

Art. 2301. He who receives what is not due to him, whether he receives it through error or knowingly, obliges himself to restore it to him from whom he has unduly received it.

Art. 2302. Right to reclaim thing unduly paid

Art. 2302. He who has paid through mistake, believing himself a debtor, may reclaim what he has paid.

Art. 2304. Thing not due

1. The validity of the additional premium financing agreement is not at issue here.

Art. 2304. A thing not due is that which is paid on the supposition of an obligation which did not exist, or from which a person had been released.

The touchstone for PFS's first claim is that its payment to the defendants must have been the payment of "a thing not due." If the payment was not due, then PFS is entitled to a return of its payment. PFS claims that its payment was "a thing not due" because the defendants had actually been paid the premiums before PFS made its payment to them.

PFS reasons as follows: When Bankers Trust paid Bacino for the premiums under the properly executed premium financing agreement, Bankers Trust effectively paid the defendants. A Louisiana statute imputes Bankers Trust's payment to the defendants whether or not they actually received the payment. In other words, the defendants are treated for legal purposes as having received Bankers Trust's payment even though Bacino never conveyed that payment to the defendants. Because PFS made its payment to the defendants after Bankers Trust paid Bacino, PFS's payment was "a thing not due," and PFS is entitled to restitution. The statute which PFS claims imputes Bankers Trust's payment to the defendants is La.Rev.Stat.Ann. § 22:1180, which states:

Any insurer which issues or delivers a policy or contract of insurance pursuant to the application or request of an agent or broker who is not authorized to represent said insurer as an agent shall be deemed to have authorized such agent or broker to receive on said insurer's behalf payment of any premium on such policy or contract of insurance. Such payment to an agent or broker shall be deemed to be payment to the insurer.

It is not the intent of this Section to create any agency relationship except for the matter of collection of premiums specifically referred to herein.

PFS's other claim for relief is based upon La.Civ.Code Ann. art. 2310 which states,

He who, through mistake has paid the debt of another to whom he believed himself indebted, has a claim to restitution from the creditor.

This right ceases, if, in consequence of the payment, the creditor has destroyed or parted with his title; but the recourse still remains to the person paying against the true debtor.

Using this provision, PFS claims that it paid the debt of another (the insureds) through a mistake (the invalid finance agreement). Therefore, the article requires the defendants to return the payment to PFS.

The district court ruled that § 22:1180 was enacted to protect insureds who are unfamiliar with agents who might not forward the premium on to the insurer. This protection is achieved by saddling the insurer with the risk of nonpayment of the premium. The reason for this statutorily created agency, the court found, was that the insurer takes the positive step of cloaking the insurance agent in apparent authority to act for the insurer. Therefore, the purpose of the statute is to estop insurers from seeking payment from insureds who have already paid the premiums to an agent or a broker. Because none of the defendants was seeking payment of the premiums for the policy from the insureds in this case, the court found that the statute was simply inapplicable.

The district court made no mention of PFS's claim under La.Civ.Code Ann. art. 2310.

We will affirm a grant of summary judgment if no genuine issues of material fact exist and if the defendants are entitled to judgment as a matter of law. *Randolph v. Laeisz,* 896 F.2d 964, 969 (5th Cir.1990). In reviewing state law determinations made by district courts, we do so *de novo* with no deference to the court's decision. *Salve Regina College v. Russell,* —— U.S. ——, 111 S.Ct. 1217, 1225, 113 L.Ed.2d 190 (1991). Because this case is in federal court on the basis of diversity of citizenship, we sit as an *Erie* court and must apply Louisiana law as we believe a Louisiana state court would in addressing the same issues. *Walker v. Sears, Roebuck & Co.,* 853 F.2d 355, 358–59 (5th Cir.1988).

First to be addressed is PFS's claim under articles 2301–02 and 2304 and § 22:1180. The foundation of this claim is that § 22:1180 applies to Bankers Trust's payment to Bacino by imputing it to the defendants. We find that it does not.

There is apparently no legislative history on § 22:1180, so we cannot garner any guidance there. The case law on the provision is also fairly sparse as there are only five reported Louisiana state court cases which address § 22:1180.[2] These cases address the availability of § 22:1180 protection to insureds; there is not even an inference that § 22:1180 protects any entity other than an insured. The only other guidance available is the district court's ruling in the case at hand. Of course, we cannot grant any deference to this opinion, but we may consider that court's analysis in coming to our decision. *Salve Regina*, 111 S.Ct. at 1221–22. Based upon all that is available to us, we conclude that the purpose of the statute is to protect potentially unwary insureds from insurance agents and brokers who fail to remit insureds' payment of premiums to the insurer. Bankers Trust is not an insured in this situation. It is a sophisticated insurance premium financing corporation which should understand the insurance business and its attendant risks. A corporation such as Bankers Trust does not need the protection of § 22:1180 which, as we view it, was enacted to protect potentially unwary insureds. *See Desoto Parish School Bd. v. INA*, 572 So.2d 310 (La.Ct.App.1990), *writ denied*, 575 So.2d 368 (La.1991) ("Having reviewed the statute and the jurisprudence construing it, we believe that the obvious purpose of R.S. § 22:1180 is to protect the insured.").

The result of this finding is that PFS's first claim fails. Because § 22:1180 is not applicable, Bankers Trust's payment is not deemed to have been received by the defendants. Because the defendants never received a premium payment until PFS made its payment directly to them, PFS's payment was not "a thing not due."

Having found PFS's first claim invalid, we now turn our attention to its claim under La.Civ.Code Ann. art. 2310. In *Continental Serv. Life & Health Ins. v. Grantham*, 811 F.2d 273 (5th Cir.1987), this court set out the four elements for recovery under article 2310. The requirements a plaintiff must establish are: (1) the existence of a valid debt, (2) that he paid the debt, (3) that it was the debt of another, and (4) that the payment was made by mistake. *Id.* at 275. It will be assumed, without being decided, that PFS met each of these requirements.

Our inquiry does not end here, however. The article provides that the right to restitution can cease in certain circumstances, and we find that those circumstances existed in this case.

The article provides that the right to restitution ceases if, "in consequence of the payment, the creditor has destroyed or parted with his title; but the recourse still remains to the person paying against the true debtor." This raises two questions. Did the defendants destroy or part with title as contemplated in the statute, and if so did they act in consequence of PFS's payment? In this case, the insurance policy issued by the defendants remained in effect throughout its term. Claims were filed and paid. We believe that by performing on the policy, the defendants sufficiently parted with title to destroy PFS's right to restitution. Our finding is supported by the holding in *Pioneer Bank & Trust Co. v. Dean's Copy Prods., Inc.*, 441 So.2d 1234 (La.Ct.App.1983). In that case, the court allowed recovery under article 2310 despite the plaintiff's negligence in making the payment in the first place. Although the court allowed restitution, it stated,

We recognize that the payor's right to restitution ceases if the creditor's title is

---

**2.** These five cases are *Desoto Parish School Bd. v. INA,* 572 So.2d 310 (La.Ct.App.1990); *Ray Gibbins Certified Welders, Inc. v. Griggs,* 543 So.2d 68 (La.Ct.App.1989); *Grover v. Ratcliff,* 526 So.2d 366 (La.Ct.App.1988); *Jackson & Jack-son, Inc. v. Louisiana Offshore Ins. Agency, Inc.,* 508 So.2d 875 (La.Ct.App.1987); and *Fidelity & Casualty Co. of New York v. Bordelon,* 428 So.2d 1162 (La.Ct.App.1983).

destroyed in consequence of the payment, but there is nothing in this record which would tend to show that the defendant has suffered any detriment as a result of receiving the payment from the bank. Under these circumstances, we find that the plaintiff is entitled to reimbursement. . . .

*Id.* at 1236 (cite omitted).

There remains the question whether the defendants parted with title as a consequence of PFS's payment. After unraveling the facts of this case, we find that they must have. As we have already decided, Bankers Trust's payment was not payment to the defendants. Therefore, PFS's payment to the defendants was the impetus for the issuance of the policy. The defendants could have refused to issue the policy up until they received PFS's payment. At that point, the defendants were obligated to honor the policy. We therefore find that the defendants performed on the policy as a consequence of PFS's payment.

Because we agree that PFS has no claim to restitution from the defendants under either of the claims presented to this court, the district court's grant of summary judgment is affirmed.